ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 22-3068

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

SALUSTHIAN LUTAMILA,
*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

BRIEF FOR APPELLANT

---

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

ISRA J. BHATTY
Asst. Federal Public Defender
625 Indiana Avenue, NW, Suite 550
Washington, DC 20004
(202) 208-7500
Isra_Bhatty@fd.org

District Court
Cr. No. 20-24 (JEB)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), defendant-appellant Salusthian Lutamila hereby states as follows:

**A.** **Parties and Amici:**

This appeal arises from a criminal conviction of defendant-appellant Salusthian Lutamila by plaintiff-appellee, the United States of America. There are no intervenors or *amici*.

**B.** **Rulings Under Review:**

This is an appeal from the judgment of the district court (the Honorable James E. Boasberg) entered on September 19, 2022 imposing a sentence after convictions for bank fraud, theft by credit-union employee, wire fraud, and money laundering. A98–99; SA4. Mr. Lutamila seeks review of the district court's application of the U.S. Sentencing Guidelines in calculating his sentence.

**C.** **Related Cases:**

There currently are no related cases. Mr. Lutamila's case has not previously been before this Court.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

TABLE OF AUTHORITIES ..................................................................iii

JURISDICTIONAL STATEMENT ...................................................... 1

RULES ................................................................................................... 1

ISSUE PRESENTED FOR REVIEW ..................................................... 1

STATEMENT OF THE CASE ................................................................ 1

    I.    Mr. Lutamila's Offenses .............................................. 1

    II.    Mr. Lutamila's Sentence.............................................. 2

SUMMARY OF ARGUMENT ................................................................ 4

ARGUMENT AND AUTHORITIES ....................................................... 6

    I.    The District Court Erroneously Included Intended
        Loss Amounts in Its Calculation of "Loss" Under
        U.S.S.G. § 2B1.1............................................................ 6

        A.    Standard of Review ............................................. 6

        B.    The Plain Text of § 2B1.1 Unambiguously
            Excludes Intended or Attempted Loss.................................... 7

        C.    The § 2B1.1 Commentary's Definition of "Loss" as
            Intended Loss Is Not Entitled to Deference in Light
            of *Kisor v. Wilkie* and *United States v. Winstead* ................. 11

    II.    The District Court's Error Warrants Resentencing.................. 20

CONCLUSION ........................................................................22

CERTIFICATE OF COMPLIANCE......................................................22

ADDENDUM

# TABLE OF AUTHORITIES

**CASES**

*Bowles v. Seminole Rock & Sand Co.,*
325 U.S. 410 (1945) .................................................................. 13, 14, 15

*Conn. Nat'l Bank v. Germain,*
503 U.S. 249 (1992) ................................................................. 17

*Gall v. United States,*
552 U.S. 38 (2007) ..................................................................... 6

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) ................................. 1, 5, 11, 12-13, 14, 15, 16, 17

*Mistretta v. U.S.,*
488 U.S. 361 (1989) ............................................................... 15-16

*Molina-Martinez v. United States,*
578 U.S. 189 (2016) ............................................................. 20-21, 22

*Scalia v. Wynnewood Ref. Co. LLC,*
978 F.3d 1175 (10th Cir. 2020) ............................................. 17

*Stinson v. United States,*
508 U.S. 36 (1993) ................................................................. 13-14, 15

*United States v. Banks,*
55 F.4th 246 (3d Cir. 2022) ..................................... 7, 8-10, 11

*United States v. Castillo,*
69 F.4th 648 (9th Cir. 2023) ............................................ 14-15

*United States v. Cutler,*
36 F.3d 406 (4th Cir. 1994) ...................................................... 7

*United States v. Dupree,*
57 F.4th 1269 (11th Cir. 2023) ............................................................ 15

*United States v. Fischer,*
64 F.4th 329 (D.C. Cir. 2023) ............................................................. 17

*United States v. Hart,*
324 F.3d 740 (D.C. Cir. 2003) ............................................................... 7

*United States v. Havis,*
927 F.3d 382 (6th Cir. 2019) ............................................................... 19

*United States v. Kennert,*
2023 WL 4977456 (6th Cir. Aug. 3, 2023) ................................ 7-8, 10-11

*United States v. Nasir,*
17 F.4th 459 (3d Cir. 2021) ........................................................ 15, 18-19

*United States v. Olejiya,*
754 F.3d 986 (D.C. Cir. 2014) ............................................................... 7

*United States v. Olivares,*
473 F.3d 1224 (D.C. Cir. 2006) ............................................................. 6

*United States v. Otunyo,*
63 F.4th 948 (D.C. Cir. 2023) ............................................................... 6

*United States v. Patel,*
2023 WL 5453747 (S.D. Fla. Aug. 23, 2023) ........................................ 10

*United States v. Riccardi,*
989 F.3d 476 (6th Cir. 2021) ........................................................ 8, 9, 20

*United States v. Smith,*
2023 WL 5420581 (6th Cir. Aug. 23, 2023) ............................................ 9

*United States v. Turk,*
626 F.3d 743 (2d Cir. 2010) ............................................................... 21

*United States v. Upshur*,
67 F.4th 178 (3d Cir. 2023) ..................................................... 17

*United States v. Winstead*,
890 F.3d 1082 (D.C. Cir. 2018)................ 1, 5, 11, 12, 15-16, 17-18, 19, 20

## STATUTES & GUIDELINES

18 U.S.C. § 657 ....................................................................... 1

18 U.S.C. § 1343 ..................................................................... 1

18 U.S.C. § 1344 ..................................................................... 1

18 U.S.C. § 1957 .................................................................. 1, 2

U.S.S.G. § 2B1.1 ..................................1, 2, 4, 5, 6, 7, 11-12, 16, 20, 21

U.S.S.G. § 2S1.1 ................................................................ 1, 21

U.S.S.G. § 3B1.3 ....................................................................... 2

U.S.S.G. § 4B1.2 ................................................................ 17, 18

## ADDITIONAL AUTHORITIES

Brief for United States in Opposition, *Tabb v. United States*,
    141 S. Ct. 2793 (2021) (No. 20-579), 2021 WL 637240 .................. 16

Brief in Opposition, *U.S. v. Sargent* (No. 23-3005),
    2023 WL 5384180 (C.A.D.C.) ........................................... 16

Loss, *Black's Law Dictionary* (11th ed. 2019)............................9

Loss, *Merriam-Webster, available at* https://www.merriam
webster.com/dictionary/loss (Aug. 31, 2023)............................8-9, 10

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. A timely notice of appeal having been filed, this Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## RULES

Relevant rules are produced in the Addendum to this brief.

## ISSUE PRESENTED FOR REVIEW

I. Whether the district court erred by calculating "loss" under U.S.S.G. § 2B1.1(b)(1)'s loss table by including "intended loss" amounts where the plain text of the guideline makes no reference to "intended loss," which is mentioned and defined only in the commentary to the Guidelines and is therefore not authoritative under *Kisor v. Wilkie* and *United States v. Winstead*?

## STATEMENT OF THE CASE

### I.  Mr. Lutamila's Offenses

On May 11, 2022, a jury found Salusthian Lutamila guilty of 21 counts of bank fraud, theft by credit-union employee, wire fraud, and money laundering, in violation of 18 U.S.C. §§ 657, 1343, 1344, and 1957. A15, A98–99. Each of these counts originated from his time as the

Director of Finance and acting Chief Financial Officer at the Inter-American Development Bank – IIC Federal Credit Union ("IDB – IIC"), a small credit union in Washington, D.C. SA5.[1] Mr. Lutamila made unauthorized transfers of money from internal credit union accounts to his own personal E*Trade account in a sum totaling $610,000. SA6, SA8. E*Trade recovered and returned all but $76,069 of the transferred funds to IDB – IIC. A144; SA9, SA21.

## II. Mr. Lutamila's Sentence

Probation calculated Mr. Lutamila's Guidelines range pursuant to U.S.S.G. § 2B1.1 and § 2S1.1. SA10. Starting at a base offense level of 7 under § 2B1.1(a)(1), Probation increased Mr. Lutamila's base offense level by 14 points by applying a loss amount of $610,000 from the § 2B1.1(b)(1) loss table. Mr. Lutamila's specific offense level was increased an additional point due to his 18 U.S.C. § 1957 conviction, *see* U.S.S.G. § 2S1.1(b)(2)(A), and then an additional two points because he abused a position of trust. *See* U.S.S.G. § 3B1.3. SA10. Probation thus arrived at a total offense level of 24, which at criminal history category I

---

[1] SA refers to entries in the Sealed Appendix.

yielded a Guidelines range of 51 to 63 months of incarceration. SA10, SA30.

At sentencing, Mr. Lutamila objected to Probation's Guidelines calculations, arguing that the "loss" amount for his offense should have been the "actual loss," i.e., $76,069, which represented the amount that remained unrecovered after E*Trade froze Mr. Lutamila's accounts. A134. That amount corresponded to a 6-point increase in the base offense level, an overall offense level of 16, and a Guidelines range of 21 to 27 months. A134, A137.

The district court disagreed, stating that "actual loss" was not "the number that I should be focused on, because that would equate somebody who stole much more money but was fortunately stopped with someone who stole a lesser amount." A144. The Court agreed with Probation that the intended loss amount of $610,000 should be used in the Guidelines calculation to arrive at a total offense level of 24 and Guidelines range of 51 to 63 months. A142; SA36. Ultimately, the Court sentenced Mr. Lutamila to 44 months of incarceration and 36 months of supervised release, a below-Guidelines sentence that accounted for Mr. Lutamila's

"upstanding life up to this point" and the need to minimize sentencing disparities. A144–45.

## SUMMARY OF ARGUMENT

Sentencing guideline § 2B1.1 begins its calculation of specific offense level by consulting the amount of economic "loss": if the "loss" exceeds $6,500, the guideline incrementally increases the defendant's base offense level up to 30 points, depending on the amount of the "loss." The calculation of "loss" is therefore tremendously consequential, and its interpretation may add years to a defendant's sentence. But § 2B1.1 does not qualify or define "loss" in any way. The only definition of "loss" appears in the Guidelines commentary, which states that "loss" is "the greater of actual loss or intended loss."

Under the district court's calculation, "loss" equaled the total amount that Mr. Lutamila stole, including the amount that was recovered and returned to the victims. That calculation was in error because the term "loss" unambiguously means the funds that the victims *actually* lost (i.e., never recovered), not funds that Mr. Lutamila attempted or intended to steal. Absent ambiguity in the plain language

4

of the Guidelines text, the district court was not permitted to include the recovered funds, i.e., the intended loss, in its "loss" calculation.

The district court's Guidelines calculation contravenes *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019), and *United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018). *Kisor* made clear that the Guidelines commentary should govern only if the text of the guideline itself is genuinely ambiguous. 139 S. Ct. at 2416. Likewise, in *Winstead*, this Court emphasized that the district court's sentencing calculation must be grounded in the text of the Guidelines themselves. 890 F.3d at 1092. As *Winstead* concluded in the context of the career offender guideline, commentary may not expand the Guidelines' plain text to include an unlisted, inchoate offense without submitting such a change for congressional review. *Id.*

Applying the "actual loss" value to the § 2B1.1 table, Mr. Lutamila's Guidelines range would decrease to 21–27 months—two to 2.5 years less than the low end of the range found by the district court. Accordingly, Mr. Lutamila's sentence must be vacated and the case remanded for resentencing.

## ARGUMENT AND AUTHORITIES

### I. The District Court Erroneously Included Intended Loss Amounts in Its Calculation of "Loss" Under U.S.S.G. § 2B1.1.

At sentencing, Mr. Lutamila argued that "loss" in § 2B1.1 should be the "actual loss" that the victims incurred, i.e., $76,069, which would exclude any amount recovered and returned to them. A134, A144. The district court rejected that argument, instead relying on the total amount that Mr. Lutamila intended and attempted to steal, i.e., $610,000, to arrive at a Guidelines range of 51 to 63 months. A142, A144. That calculation was in error because the plain text of § 2B1.1 unambiguously excludes intended or attempted loss.

### A. Standard of Review

The district court's interpretation of Guidelines text governing Mr. Lutamila's sentence is a question of law that this Court reviews *de novo*. *United States v. Otunyo*, 63 F.4th 948, 956 (D.C. Cir. 2023). "[I]ncorrect legal interpretations of the Guidelines" constitute legal error. *United States v. Olivares*, 473 F.3d 1224, 1226 (D.C. Cir. 2006). Further, an improper calculation of the Guidelines range constitutes significant procedural error. *Gall v. United States*, 552 U.S. 38, 51 (2007).

This Court "accept[s] the district court's factual findings unless they are clearly erroneous, and gives 'due deference' to that court's application of the Guidelines to the facts." *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (internal quotation marks omitted).

## B. The Plain Text of § 2B1.1 Unambiguously Excludes Intended or Attempted Loss.

For theft and fraud offenses, the Sentencing Guidelines instruct courts to "increase the offense level" in incremental amounts based on the "loss" amount. U.S.S.G. § 2B1.1. Recognizing that "'the Sentencing Guidelines should be applied as written,'" *United States v. Hart*, 324 F.3d 740, 745 (D.C. Cir. 2003) (quoting *United States v. Cutler*, 36 F.3d 406, 408 (4th Cir. 1994)), the interpretation of "loss" in § 2B1.1 must "begin[] with the language of the [guideline] itself." *Id.* (internal quotation marks omitted). Where, as here, the term "loss" carries no definition, it is presumed to carry its "ordinary meaning," and "[t]he ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss.'" *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022). That is, "loss" unambiguously means the harm actually done—i.e, the sum *lost*—as a result of the defendant's theft. Judge Murphy's concurring opinion in *United States v. Kennert*, No. 22-1998, 2023 WL 4977456 (6th Cir. Aug. 3, 2023) summarizes why:

> No speaker versed in the English language would say that 'the loss' from a fraudster's conduct 'exceeded $6,500' if the speaker really meant to convey that the fraudster intended—but failed—to cause that loss. Rather, anyone who heard this phrase would presume that the speaker was referring to the damage that resulted from the crime. That is because this word, when used alone, refers to the 'amount lost,' not the amount almost lost or intended to be lost.

*Id.* at *4.

The understanding of "loss" as "actual loss" is supported by dictionary definitions, which "identify the range of meanings that a reasonable person would understand a word like 'loss' to have." *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021). The current edition of Merriam-Webster defines loss as:

B. Destruction, ruin;
C. a(1): the act or fact of being unable to keep or maintain something or someone; (2): the partial or complete deterioration or absence of a physical capability or function; b: the **harm** or privation resulting from losing or being separated from someone or something; c: an instance of **losing** someone or something;
D. **a person or thing or an amount that is lost** . . .
E. a: failure to gain, win, obtain, or utilize; b: an amount by which the cost of something exceeds its selling price;
F. **decrease** in amount, magnitude, value, or degree;
G. the amount of an insured's financial detriment by death or damage that the insurer is liable for;
H. [in football]: the distance the ball is moved away from the goal during a play.

Loss, *Merriam-Webster*, *available at* https://www.merriam-webster.com/dictionary/loss (Aug. 31, 2023) (emphasis added); *see also Banks*, 55 F.4th at 257–58 (collecting similar definitions); *Riccardi*, 989 F.3d at 486 (same).

> Black's Law Dictionary similarly defines "loss" as:
>
> 1. An undesirable outcome of a risk; the disappearance or diminution of value, usu. in an unexpected or relatively unpredictable way. • When the loss is a decrease in value, the usual method of calculating the loss is to ascertain the amount by which a thing's original cost exceeds its later selling price. 2. Tax. The excess of a property's adjusted value over the amount realized from its sale or other disposition. Also termed realized loss. 3. Insurance. The amount of financial detriment caused by an insured person's death or an insured property's damage, for which the insurer becomes liable. 4. The failure to maintain possession of a thing.

*Black's Law Dictionary*, (11th ed. 2019) (citations removed).

It follows from these definitions that in the economic context "loss" unambiguously takes the ordinary meaning of a sum that is *lost*. *Id.* (defining loss as a value that has "disappear[ed]"). As the Sixth Circuit succinctly put it: "the dictionary definition of the term 'loss' does not contemplate anything close to intended loss." *United States v. Smith*, No. 22-1506, 2023 WL 5420581, at *6 (6th Cir. Aug. 23, 2023); *see also Banks*, 55 F.4th at 258 (finding it unnecessary to "decide whether one clear

meaning of the word 'loss' emerges broadly, covering every application of the word" and answering in affirmative when "decid[ing] whether, in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word 'loss' is the loss the victim actually suffered"). In other words, the term "loss" does not refer to a sum that is *almost* lost but then avoided, or lost and then reinstated, but rather a loss—a harm—actually borne by the victim. *Banks*, 55 F.4th at 257–58 (finding "loss" to carry only one possible meaning, i.e., actual loss); *United States v. Patel*, No. 19-CR-80181-RAR, 2023 WL 5453747, at *2 (S.D. Fla. Aug. 23, 2023) ("Dictionary definitions of 'loss' vary in scope—but all clearly contemplate a loss actually suffered by the victim.").

None of the dictionary definitions allow for considering "nonexistent" losses. *Kennert*, 2023 WL 4977456, at *4 (Murphy, J., concurring). Indeed, an unactualized "loss" does not amount to a "loss" under any definition, as no "amount [was] lost" and no "decrease" occurred. Loss, *Merriam-Webster, available at* https://www.merriam-webster.com/dictionary/loss (Aug. 31, 2023). Thus, in situations where a loss is only "intended," or attempted and then "stopped" as the district court found here, that tried-but-failed-at loss is no "loss" at all. *See*

*Kennert*, 2023 WL 4977456, at \*4 (Murphy, J., concurring) (finding "actual loss" to be redundant and "useful only if a speaker seeks to contrast a fulfilled harm with something else (such as a barely avoided one)"); *Banks*, 55 F.4th at 257 (finding absence of adjective qualifying "loss" to "indicate[] that the Guideline does not include intended loss"). The district court's decision to include intended loss in its calculation of "loss" under § 2B1.1 therefore contravened the plain text of the § 2B1.1 guideline.

### C. The § 2B1.1 Commentary's Definition of "Loss" as Intended Loss Is Not Entitled to Deference in Light of *Kisor v. Wilkie* and *United States v. Winstead.*

The text of § 2B1.1 itself refers to "loss" without qualification and no mention of "intended loss." That distinction does not appear until the Guidelines *commentary*, which explains that "loss" is the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss," per the commentary, is the "reasonably foreseeable pecuniary harm that resulted from the offense," *id.* § 2B1.1 cmt. n.3(A)(i), while "intended loss"

is "the pecuniary harm that the defendant purposely sought to inflict," *id.* § 2B1.1 cmt. n.3(A)(ii).[2]

Reflecting the directives within the § 2B1.1 commentary, the district court used the $610,000 "intended loss" figure to capture the loss that Mr. Lutamila sought to impose on his victims before he was "fortunately stopped." *See* A144. Such deference would be inappropriate, however, under the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019), and this Court's precedent in *United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018).

*Kisor* anchors the Court's inquiry as to when deference to the Guidelines commentary is warranted. In *Kisor*, the Supreme Court made clear that courts should only defer to an agency's interpretation of its own

---

[2] The Commentary also defines "pecuniary harm" and "reasonably foreseeable pecuniary harm":

> (iii) Pecuniary Harm.—"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.
> (iv) Reasonably Foreseeable Pecuniary Harm.—For purposes of this guideline, 'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).

rules if the text of the rule itself, after an exhaustion of the typical tools of construction, is actually ambiguous. *Id.* at 2415. Further, "[i]f genuine ambiguity remains," the agency's reading must be "reasonable," i.e., it must "come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2416. And even more, a court must make an "independent inquiry" into the "character and context" of the reasonable interpretations of the rule. *Id.* In other words, there must be both a genuine ambiguity in an agency's rule and the character and context of an agency's interpretation must fall within the rule's zone of ambiguity before deference is warranted.

Although the Court had previously held in *Stinson v. United States*, 508 U.S. 36, 45 (1993), that Guidelines commentary "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation,'" there is good reason to conclude that *Kisor*'s more demanding standard for deference extends to the Sentencing Guidelines. *Id.* (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). As *Stinson* itself explained, the Sentencing Commission "promulgate[d] the guidelines by virtue of an express congressional delegation of authority for rulemaking"—the "equivalent of legislative

rules adopted by federal agencies." *Stinson*, 508 U.S. at 45–46. But unlike the Guidelines themselves—and similar to an agency's interpretation of its own rules—the Guidelines commentary is not subject to mandatory congressional review. *Id.* Extending the administrative agency analogy, then, "commentary [should] be treated," and receive the same level of deference as, "an agency's interpretation of its own legislative rule." *Id.* at 45.

That is why, as the Ninth Circuit recently explained, "[t]he more demanding deference standard articulated in *Kisor* applies to the Guidelines' commentary." *United States v. Castillo*, 69 F.4th 648, 655 (9th Cir. 2023). The Ninth Circuit summarized:

> *Kisor* directly examined and narrowed *Seminole Rock* and *Auer* deference in the context of an administrative agency's interpretation of its own regulation, noting that such deference is not permitted without first finding the regulation ambiguous. *Stinson* deference is directly grounded in *Seminole Rock* and *Auer* deference. Indeed the deference standard articulated by the Court in *Stinson*—that commentary "must be given 'controlling weight unless it is plainly erroneous or inconsistent'" with the guideline's text— is a direct quotation from *Seminole Rock*. And although *Kisor* did not distinguish between an agency's interpretation of its own regulations and the commentary's interpretation of the Guidelines, "the only way to harmonize [*Kisor* and *Stinson*] is to conclude that *Kisor*'s gloss on *Auer* and *Seminole Rock* applies to *Stinson*."

*Id.* at 655–56 (citations omitted). At least three other circuits have agreed. *See United States v. Nasir*, 17 F.4th 459, 470–71 (3d Cir. 2021) (en banc); *Riccardi*, 989 F.3d at 484–85 (recognizing that broad deference to Guidelines' commentary "could not stand after *Kisor*" and that *Kisor* "must awake us 'from our slumber of reflexive deference' to the commentary") (citation omitted); *United States v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023) (en banc) ("*Stinson* adopted word for word the test the *Kisor* majority regarded as a 'caricature,' so the continued mechanical application of that test would conflict directly with *Kisor*.").

Although this Court has not weighed in on the applicability of *Kisor*'s deference standard to the Guidelines Commentary, this Court's decision in *Winstead* recognized *Stinson* deference as *Seminole Rock* deference and warned of the "troubling" dangers of deferring to Guidelines commentary that expands a guideline beyond its plain text. 890 F.3d at 1092. The Court wrote:

> [T]he Sentencing Commission wields the authority to dispense "significant, legally binding prescriptions governing application of governmental power against private individuals—indeed, application of the ultimate governmental power, short of capital punishment." If the Commission wishes to expand the definition of "controlled substance offenses" to include attempts, it may seek to amend the language of the guidelines by submitting the change for

congressional review. . . . But surely *Seminole Rock* deference does not extend so far as to allow it to invoke its general interpretive authority via commentary . . . to impose such a massive impact on a defendant with no grounding in the guidelines themselves.

*Id.* (quoting *Mistretta v. U.S.*, 488 U.S. 361, 413 (1989) (Scalia, J., dissenting)).

Finally, in briefs before this Court and the Supreme Court, the government has taken the position that *Kisor* "sets forth the authoritative standards for determining whether particular commentary is entitled to deference." Brief in Opposition 18, *U.S. v. Sargent* (mem.) (No. 23-3005), 2023 WL 5384180 (C.A.D.C.); Brief for United States in Opposition 15, *Tabb v. United States*, 141 S. Ct. 2793 (2021) (mem.) (No. 20-579), 2021 WL 637240.

All told, the weight of relevant authority supports an understanding that *Kisor*'s cabined deference standard applies to the Guidelines commentary, which means that the § 2B1.1 commentary's definition of loss is authoritative only if the meaning of "loss" in § 2B1.1 is genuinely ambiguous. It is not. As explained *supra*, the plain text of § 2B1.1 reveals that the term "loss" is plainly *unambiguous*. The

ordinary meaning of "loss" is a loss that has been actualized—not intended, attempted, or unrealized. *See supra* at I.B.

Faced with unambiguous Guidelines text, this Court under *Kisor* "need not go further and examine [the text's] 'structure, history, and purpose' or determine if the relevant Guidelines Commentary merits *Auer* deference." *United States v. Upshur*, 67 F.4th 178, 182 n.1 (3d Cir. 2023); *Scalia v. Wynnewood Ref. Co., LLC*, 978 F.3d 1175, 1181 (10th Cir. 2020) (clarifying that "*Kisor* did not indicate that courts must consider [structure, history, and purpose] before finding a statute *unambiguous*"). "[P]lain and unambiguous" Guidelines text must be read "according to its terms," which means the Court's "'judicial inquiry is complete'" upon enforcing that text as written. *United States v. Fischer*, 64 F.4th 329, 335 (D.C. Cir. 2023) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

This Court's precedent in *United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018), further confirms that "loss" must be read in a manner dictated by its plain text—i.e., as actual loss. In *Winstead*, this Court assessed whether attempted drug offenses were included within the definitional text of the career offender guideline, § 4B1.2 and

concluded that "attempts [were] only added in the commentary to the guidelines," not their plain text. *Id.* at 1088. In so concluding, the Court found that the "detailed definition" in § 4B1.2(b) "clearly excludes inchoate offenses" like attempted distribution. *Id.* at 1091. The Court explained further that "the Commission showed within § 4B1.2 itself that it knows how to include attempted offenses when it intends to do so," citing § 4B1.2(a)(1), which defines a "crime of violence" as an offense that "has as an element the use, attempted use, or threatened use of physical force." *Id.* In other words, "when enumerating a list of specific offenses that qualify to support career offender status, the drafters declined to include attempt despite its presence elsewhere." *Id.* at 1092. The same logic applies here. "Loss" does not mean intended or attempted loss in this case any more than "attempted distribution" meant "distribution" in *Winstead.*

Moreover, the Court in *Winstead* sternly cautioned against deferring to commentary in situations where the commentary stretches the meaning of the Guidelines beyond their plain text. *Id.*; *see also Nasir*, 17 F. 4th at 472 (en banc) (Bibas, J. concurring) (finding deference to commentary inappropriate when the commentary "sweeps more broadly

than the plain language of the text it interprets"). The proper way to expand the meaning of the Guidelines, *Winstead* explained, is not through commentary but by "amend[ing] the language of the guidelines by submitting the change for congressional review." 890 F.3d at 1092. "[A]pplication notes are to be interpretations of, not additions to, the Guidelines themselves. If that were not so, the institutional constraints that make the Guidelines constitutional in the first place—congressional review and notice and comment—would lose their meaning." *United States v. Havis*, 927 F.3d 382, 386–87 (6th Cir. 2019).

Here, the district court endorsed the commentary's definition of "loss" as intended loss because it thought that approach was fairer in distinguishing between Mr. Lutamila, who intended to steal $610,000 but ultimately only caused his victims to lose $76,069 because he was stopped, and a hypothetical defendant who intended to steal $76,069 from the outset and actually caused his victims to lose that amount because he was never stopped. A144. But that purported purpose behind the preference for using "intended loss" has no grounding in the Guidelines' text, which does not suggest varying types of loss or endorse in any way the district court's claimed fairness rationale. Indeed, the

plain text of § 2B1.1 would more faithfully suggest a different fairness rationale—one in which instead of treating an incomplete attempt to steal as the same as a completed theft, the actual harm *caused* to the victim is emphasized over the defendant's mental state.

Ultimately, to the extent the Commission wishes to set forth a preference for using intended or attempted loss to measure culpability, and "if the Commission seeks to keep individuals behind bars for longer periods of time based on this type of . . . loss amount," that is a "substantive policy decision" that "belongs in the guidelines, not in the commentary." *Riccardi*, 989 F.3d at 487; *see also Winstead*, 890 F.3d at 1092 ("If the Commission wishes to expand the definition of 'controlled substance offenses' to include attempts, it may seek to amend the language of the guidelines by submitting the change for congressional review."). Because there is no genuine ambiguity supporting deference to the commentary to § 2B1.1, the district court erred by straying from the guideline's plain text and defining "loss" as intended loss.

**II. The District Court's Error Warrants Resentencing.**

The Sentencing Guidelines' "central role in sentencing means that an error related to the Guidelines can be particularly serious." *Molina-*

*Martinez v. United States*, 578 U.S. 189, 199 (2016). For Mr. Lutamila,

that error was especially so. As the Second Circuit put it, "by far the most

consequential determination a district court must make when sentencing

a defendant under [§ 2B1.1] is the amount of loss caused by the

defendant's crime, as this factor can increase the adjusted offense level

by as few as zero or as many as 30 points, depending on the loss as

measured in dollars." *United States v. Turk*, 626 F.3d 743, 748 (2d Cir.

2010). Here, the district court's inclusion of intended loss in its § 2B1.1

calculation resulted in a 30-month difference at the low end of the

resulting guideline range (21 months compared to 51 months). The table

below captures this disparity:

| | Calculation Using "Intended Loss" | Calculation Using "Actual Loss" |
|---|---|---|
| Baseline Offense Level | 7 | 7 |
| Increase Based on § 2B1.1 Loss Table | **+14** | **+6** |
| Additional Increase under § 2S1.1(b)(2)(A) | +1 | +1 |
| Adjustment for Role in Offense | +2 | +2 |
| Total Offense Level | 24 | 16 |
| Corresponding Sentencing Range | 51 to 63 months | 21 to 27 months |

Because the district court's improper calculation of the Guidelines range constitutes "significant procedural error," this case must be remanded for its correction and resentencing. *Molina-Martinez*, 578 U.S. at 199.

## CONCLUSION

For the reasons above, this Court Mr. Lutamila's sentence should be vacated and the case remanded for resentencing.

Respectfully submitted,

A. J. Kramer
Federal Public Defender

_____/s/_____
Isra Javed Bhatty
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500
Isra_bhatty@fd.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Appellant's Opening Brief was prepared in Century Schoolhouse 14-point font pursuant to Fed. R. App. P. 27(d)(2) and contains 4,286 words.

_____/s/_____
Isra Bhatty
Assistant Federal Public Defender

# <u>ADDENDUM</u>

**§2B1.1. LARCENY, EMBEZZLEMENT, AND OTHER FORMS OF THEFT; OFFENSES INVOLVING STOLEN PROPERTY; PROPERTY DAMAGE OR DESTRUCTION; FRAUD AND DECEIT; FORGERY; OFFENSES INVOLVING ALTERED OR COUNTERFEIT INSTRUMENTS OTHER THAN COUNTERFEIT BEARER OBLIGATIONS OF THE UNITED STATES**

(a) Base Offense Level:

(1) 7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or

(2) 6, otherwise.

(b) Specific Offense Characteristics

(1) If the loss exceeded $6,500, increase the offense level as follows:

| Loss (apply the greatest) | Increase in Level |
|---|---|
| (A) $6,500 or less | no increase |
| (B) More than $6,500 | add 2 |
| (C) More than $15,000 | add 4 |
| (D) More than $40,000 | add 6 |
| (E) More than $95,000 | add 8 |
| (F) More than $150,000 | add 10 |
| (G) More than $250,000 | add 12 |
| (H) More than $550,000 | add 14 |
| (I) More than $1,500,000 | add 16 |
| (J) More than $3,500,000 | add 18 |
| (K) More than $9,500,000 | add 20 |
| (L) More than $25,000,000 | add 22 |
| (M) More than $65,000,000 | add 24 |
| (N) More than $150,000,000 | add 26 |
| (O) More than $250,000,000 | add 28 |

| Loss (apply the greatest) | Increase in Level |
|---|---|
| (P) More than $550,000,000 | add 30. |

(2) (Apply the greatest) If the offense—

   (A) (i) involved 10 or more victims; (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by 2 levels;

   (B) resulted in substantial financial hardship to five or more victims, increase by 4 levels; or

   (C) resulted in substantial financial hardship to 25 or more victims, increase by 6 levels.

(3) If the offense involved a theft from the person of another, increase by 2 levels.

(4) If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 2 levels.

(5) If the offense involved theft of, damage to, destruction of, or trafficking in, property from a national cemetery or veterans' memorial, increase by 2 levels.

(6) If (A) the defendant was convicted of an offense under 18 U.S.C. § 1037; and (B) the offense involved obtaining electronic mail addresses through improper means, increase by 2 levels.

(7) If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels; (ii) more than $7,000,000, increase by 3 levels; or (iii) more than $20,000,000, increase by 4 levels.

(8) (Apply the greater) If—

(A) the offense involved conduct described in 18 U.S.C. § 670, increase by 2 levels; or

(B) the offense involved conduct described in 18 U.S.C. § 670, and the defendant was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product, increase by 4 levels.

(9) If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency; (B) a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding; (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines; or (D) a misrepresentation to a consumer in connection with obtaining, providing, or furnishing financial assistance for an institution of higher education, increase by 2 levels. If the resulting offense level is less than level 10, increase to level 10.

(10) If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(11) If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(12) If the offense involved conduct described in 18 U.S.C. § 1040, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(13) If the defendant was convicted under 42 U.S.C. § 408(a), § 1011(a), or § 1383a(a) and the statutory maximum term of ten years' imprisonment applies, increase by 4 levels. If the resulting offense level is less than level 12, increase to level 12.

(14) (Apply the greater) If the offense involved misappropriation of a trade secret and the defendant knew or intended—

    (A) that the trade secret would be transported or transmitted out of the United States, increase by 2 levels; or

    (B) that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by 4 levels.

    If subparagraph (B) applies and the resulting offense level is less than level 14, increase to level 14.

(15) If the offense involved an organized scheme to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

(16) If the offense involved (A) the conscious or reckless risk of death or serious bodily injury; or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

(17) (Apply the greater) If—

    (A) the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels; or

(B) the offense (i) substantially jeopardized the safety and soundness of a financial institution; or (ii) substantially endangered the solvency or financial security of an organization that, at any time during the offense, (I) was a publicly traded company; or (II) had 1,000 or more employees, increase by 4 levels.

(C) The cumulative adjustments from application of both subsections (b)(2) and (b)(17)(B) shall not exceed 8 levels, except as provided in subdivision (D).

(D) If the resulting offense level determined under subdivision (A) or (B) is less than level 24, increase to level 24.

(18) If (A) the defendant was convicted of an offense under 18 U.S.C. § 1030, and the offense involved an intent to obtain personal information, or (B) the offense involved the unauthorized public dissemination of personal information, increase by 2 levels.

(19) (A) (Apply the greatest) If the defendant was convicted of an offense under:

(i) 18 U.S.C. § 1030, and the offense involved a computer system used to maintain or operate a critical infrastructure, or used by or for a government entity in furtherance of the administration of justice, national defense, or national security, increase by 2 levels.

(ii) 18 U.S.C. § 1030(a)(5)(A), increase by 4 levels.

(iii) 18 U.S.C. § 1030, and the offense caused a substantial disruption of a critical infrastructure, increase by 6 levels.

(B) If subdivision (A)(iii) applies, and the offense level is less than level 24, increase to level 24.

(20) If the offense involved—

(A) a violation of securities law and, at the time of the offense, the defendant was (i) an officer or a director of a publicly traded company;

(ii) a registered broker or dealer, or a person associated with a broker or dealer; or (iii) an investment adviser, or a person associated with an investment adviser; or

(B) a violation of commodities law and, at the time of the offense, the defendant was (i) an officer or a director of a futures commission merchant or an introducing broker; (ii) a commodities trading advisor; or (iii) a commodity pool operator,

increase by 4 levels.

(c) Cross References

(1) If (A) a firearm, destructive device, explosive material, or controlled substance was taken, or the taking of any such item was an object of the offense; or (B) the stolen property received, transported, transferred, transmitted, or possessed was a firearm, destructive device, explosive material, or controlled substance, apply §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy), §2D2.1 (Unlawful Possession; Attempt or Conspiracy), §2K1.3 (Unlawful Receipt, Possession, or Transportation of Explosive Materials; Prohibited Transactions Involving Explosive Materials), or §2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition), as appropriate.

(2) If the offense involved arson, or property damage by use of explosives, apply §2K1.4 (Arson; Property Damage by Use of Explosives), if the resulting offense level is greater than that determined above.

(3) If (A) neither subdivision (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically

covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

(4) If the offense involved a cultural heritage resource or a paleontological resource, apply §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources), if the resulting offense level is greater than that determined above.

**Commentary**

Statutory Provisions: 7 U.S.C. §§ 6, 6b, 6c, 6h, 6o, 13, 23; 15 U.S.C. §§ 50, 77e, 77q, 77x, 78j, 78ff, 80b-6, 1644, 6821; 18 U.S.C. §§ 38, 225, 285–289, 471–473, 500, 510, 553(a)(1), 641, 656, 657, 659, 662, 664, 1001–1008, 1010–1014, 1016–1022, 1025, 1026, 1028, 1029, 1030(a)(4)–(5), 1031, 1037, 1040, 1341–1344, 1348, 1350, 1361, 1363, 1369, 1702, 1703 (if vandalism or malicious mischief, including destruction of mail, is involved), 1708, 1831, 1832, 1992(a)(1), (a)(5), 2113(b), 2282A, 2282B, 2291, 2312–2317, 2332b(a)(1), 2701; 19 U.S.C. § 2401f; 29 U.S.C. § 501(c); 42 U.S.C. § 1011; 49 U.S.C. §§ 14915, 30170, 46317(a), 60123(b). For additional statutory provision(s), see Appendix A (Statutory Index).

**Application Notes:**

1. Definitions.—For purposes of this guideline:

"Cultural heritage resource" has the meaning given that term in Application Note 1 of the Commentary to §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources).

"Equity securities" has the meaning given that term in section 3(a)(11) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(11)).

"Federal health care offense" has the meaning given that term in 18 U.S.C. § 24.

"Financial institution" includes any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. "Union or employee pension fund" and "any health, medical, or hospital insurance association," primarily include large pension funds that serve many persons (e.g., pension funds of large national and international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons.

"Firearm" and "destructive device" have the meaning given those terms in the Commentary to §1B1.1 (Application Instructions).

"Foreign instrumentality" and "foreign agent" have the meaning given those terms in 18 U.S.C. § 1839(1) and (2), respectively.

"Government health care program" means any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by federal or state government. Examples of such programs are the Medicare program, the Medicaid program, and the CHIP program.

"Means of identification" has the meaning given that term in 18 U.S.C. § 1028(d)(7), except that such means of identification shall be of an actual (i.e., not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct).

"National cemetery" means a cemetery (A) established under section 2400 of title 38, United States Code; or (B) under the jurisdiction of the Secretary of the Army, the Secretary of the Navy, the Secretary of the Air Force, or the Secretary of the Interior.

"Paleontological resource" has the meaning given that term in Application Note 1 of the Commentary to §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources).

"Personal information" means sensitive or private information involving an identifiable individual (including such information in the possession of a third party), including (A) medical records; (B) wills; (C) diaries; (D) private correspondence, including e-mail; (E) financial records; (F) photographs of a sensitive or private nature; or (G) similar information.

"Pre-retail medical product" has the meaning given that term in 18 U.S.C. § 670(e).

"Publicly traded company" means an issuer (A) with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l); or (B) that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)). "Issuer" has the meaning given that term in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. § 78c).

"Supply chain" has the meaning given that term in 18 U.S.C. § 670(e).

"Theft from the person of another" means theft, without the use of force, of property that was being held by another person or was within arms' reach. Examples include pick-pocketing and non-forcible purse-snatching, such as the theft of a purse from a shopping cart.

"Trade secret" has the meaning given that term in 18 U.S.C. § 1839(3).

"Veterans' memorial" means any structure, plaque, statue, or other monument described in 18 U.S.C. § 1369(a).

"Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. "Person" includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

2. Application of Subsection (a)(1).—

(A) "Referenced to this Guideline".—For purposes of subsection (a)(1), an offense is "referenced to this guideline" if (i) this guideline is the applicable Chapter Two guideline specifically referenced in Appendix A (Statutory Index) for the offense of conviction, as determined under the provisions of §1B1.2 (Applicable Guidelines); or (ii) in the case of a conviction for conspiracy, solicitation, or attempt to which §2X1.1 (Attempt, Solicitation, or Conspiracy) applies, this guideline is the appropriate guideline for the offense the defendant was convicted of conspiring, soliciting, or attempting to commit.

(B) Definition of "Statutory Maximum Term of Imprisonment".—For purposes of this guideline, "statutory maximum term of imprisonment" means the maximum term of imprisonment authorized for the offense of conviction, including any increase in that maximum term under a statutory enhancement provision.

(C) Base Offense Level Determination for Cases Involving Multiple Counts.—In a case involving multiple counts sentenced under this guideline, the applicable base offense level is determined by the count of conviction that provides the highest statutory maximum term of imprisonment.

3. Loss Under Subsection (b)(1).—This application note applies to the determination of loss under subsection (b)(1).

(A) General Rule.—Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.

(i) Actual Loss.—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

(ii) Intended Loss.—"Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

(iii) Pecuniary Harm.—"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

(iv) Reasonably Foreseeable Pecuniary Harm.—For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

(v) Rules of Construction in Certain Cases.—In the cases described in subdivisions (I) through (III), reasonably foreseeable pecuniary harm shall be considered to include the pecuniary harm specified for those cases as follows:

(I) Product Substitution Cases.—In the case of a product substitution offense, the reasonably foreseeable pecuniary harm includes the reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered, or of retrofitting the product so that it can be used for its intended purpose, and the reasonably foreseeable costs of rectifying the actual or potential disruption to the victim's business operations caused by the product substitution.

(II) Procurement Fraud Cases.—In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other

participants of repeating or correcting the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable.

(III) Offenses Under 18 U.S.C. § 1030.—In the case of an offense under 18 U.S.C. § 1030, actual loss includes the following pecuniary harm, regardless of whether such pecuniary harm was reasonably foreseeable: any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of interruption of service.

(B) Gain.—The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.

(C) Estimation of Loss.—The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See 18 U.S.C. § 3742(e) and (f).

The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:

(i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

(ii) In the case of proprietary information (e.g., trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense.

(iii) The cost of repairs to damaged property.

(iv) The approximate number of victims multiplied by the average loss to each victim.

(v) The reduction that resulted from the offense in the value of equity securities or other corporate assets.

(vi) More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

(D) Exclusions from Loss.—Loss shall not include the following:

(i) Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs.

(ii) Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense.

(E) Credits Against Loss.—Loss shall be reduced by the following:

(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

(ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

(iii) Notwithstanding clause (ii), in the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere.

In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value. In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value.

(F) Special Rules.—Notwithstanding subdivision (A), the following special rules shall be used to assist in determining loss in the cases indicated:

(i) Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes.—In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device. However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account (including an electronic serial number/mobile identification number (ESN/MIN) pair), and that means was only possessed, and not used, during the commission of the offense, loss shall be not less than $100 per unused means. For purposes of this subdivision, "counterfeit access device" and "unauthorized access device" have the meaning given those terms in Application Note 10(A).

(ii) Government Benefits.—In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits

obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

(iii) Davis–Bacon Act Violations.—In a case involving a Davis–Bacon Act violation (i.e., a violation of 40 U.S.C. § 3142, criminally prosecuted under 18 U.S.C. § 1001), the value of the benefits shall be considered to be not less than the difference between the legally required wages and actual wages paid.

(iv) Ponzi and Other Fraudulent Investment Schemes.—In a case involving a fraudulent investment scheme, such as a Ponzi scheme, loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment (i.e., the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme).

(v) Certain Other Unlawful Misrepresentation Schemes.—In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

(vi) Value of Controlled Substances.—In a case involving controlled substances, loss is the estimated street value of the controlled substances.

(vii) Value of Cultural Heritage Resources or Paleontological Resources.—In a case involving a cultural heritage resource or paleontological resource, loss attributable to that resource shall be determined in accordance with the rules for determining the

"value of the resource" set forth in Application Note 2 of the Commentary to §2B1.5.

(viii) Federal Health Care Offenses Involving Government Health Care Programs.—In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted.

(ix) Fraudulent Inflation or Deflation in Value of Securities or Commodities.—In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—

(I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and

(II) multiplying the difference in average price by the number of shares outstanding.

In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed

economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

. . .